In re Interest of Dennis W., alleged to be
a mentally ill dangerous person.
Dennis W., appellant, v. Mental Health Board
of Hall County, Nebraska, appellee.
717 N.W.2d 488

Filed June 27, 2006.    No. A-05-1397.

Stacy R. Nonhof, Deputy Hall County Public Defender, for appellant.

Matthew R. Molsen, Deputy Hall County Attorney, for appellee.

SIEVERS, MOORE, and CASSEL, Judges.

SIEVERS, Judge.

The Hall County Mental Health Board (the Board) found the appellant, Dennis W., to be a mentally ill and dangerous person and found that the least restrictive treatment option available was inpatient care through the Nebraska Department of Health and Human Services. The district court for Hall County affirmed the decision of the Board by concluding that there was no error in allowing Dr. James Fish to remain present during the hearing, that there was no privilege Dennis could claim with respect to Dr. Mary Paine, and that the decision to commit Dennis to an inpatient facility was the least restrictive treatment alternative, given the unrefuted testimony of two expert psychologists. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 31, 2000, Dennis pled nolo contendere to two counts of sexual assault of a child, Class IIIA felonies. The district judge released Dennis pending sentencing. A presentence investigation was completed, and on March 20, 2000, the district judge found that Dennis was not a fit candidate for probation and sentenced Dennis to 4½ to 5 years' imprisonment on count I and to 4½ to 5 years' imprisonment on count II, with the sentences to run consecutively. In addition, the district judge ordered that within 60 days of the date of commitment, the Department of Public Institutions would conduct an evaluation of Dennis for purposes of determining whether a treatment program would be appropriate.

Approximately 5 years later, on March 13, 2005, the Nebraska Department of Correctional Services (DCS) released Dennis. On March 15, 2 days later, Dennis joined the "House for New Life," a Christian-based transitional living facility for ex-offenders located in a residential neighborhood in Lincoln, Nebraska. There are two elementary schools within a 12-block radius of the House for New Life and an ice cream store nearby. On April 6, Dennis began seeing Dr. Paine, a licensed psychologist, on an outpatient basis.

On April 28, 2005, a deputy Hall County Attorney, representing the State of Nebraska, petitioned the Board to institute proceedings in behalf of Dennis, alleging that he was a mentally ill and dangerous person. The petition was supported by an affidavit from the deputy attorney which referred to a letter from an employee of DCS regarding the facts surrounding Dennis' conviction and release. On July 30, Dennis was taken into emergency protective custody and was sent to Richard H. Young Hospital (Richard Young Hospital) for an evaluation. Dr. Fish, a clinical psychologist, evaluated Dennis. Dr. Fish met with Dennis on August 1 and 3 for approximately 1½ hours each time. Dennis told Dr. Fish that Dennis was released from confinement in March 2005. During the evaluation, Dr. Fish requested that Dennis sign a release to both Dr. Paine, whom Dennis indicated he had been seeing for treatment on an outpatient basis since his release, and DCS, where there was a sex offender treatment program that Dennis said he had participated in. Dennis signed

a release for Dr. Paine but not for DCS. While at Richard Young Hospital and before Dr. Fish contacted Dr. Paine regarding Dennis' treatment, Dennis spoke with Daniel Stogsdill, an attorney and a cofounder of the House for New Life. Stogsdill told Dennis to provide Richard Young Hospital with a written notice revoking the release of information, which Dennis did. Dr. Fish did not have time to speak with Dr. Paine before Dennis' revocation. During the evaluation, Dr. Fish formed an opinion as to Dennis' diagnosis; however, Dr. Fish needed the background information about Dennis' prior treatment to form an opinion as to Dennis' level of risk of reoffending and to the least restrictive option for Dennis' treatment.

On August 11 and 12, 2005, a hearing to determine whether Dennis was mentally ill and dangerous was held before the Board. The State's attorney agreed to the defense attorney's request for sequestration of the witnesses, with the exception of Dr. Fish. The Board ruled that before it would allow Dr. Fish to be present for the other witnesses' testimony, the State would have to show that his presence was necessary to its case. After the parties stipulated that Dr. Fish was a licensed practicing psychologist and an expert, he testified to his role in evaluating Dennis for the purpose of the emergency protective custody hearing. Dr. Fish testified about his attempt to secure releases of medical information from Dr. Paine and from DCS, which we earlier detailed. Dr. Fish testified that the background information was important in forming an opinion as to Dennis' level of risk of reoffending and to the least restrictive treatment option for Dennis. In particular, Dr. Fish testified that he needed to know

> how [Dennis] has responded to treatment, whether [Dennis] has been in treatment, whether [Dennis has] completed treatment successfully, what the opinions of those professionals were with regard to [Dennis'] progress and outcome to that treatment [and] to what extent [Dennis] has been able to identify his own risk factors as well as employ strategies to prevent any sort of reoffending.

Dr. Fish also stated that knowing how well a patient reported his or her history to others would assist the doctor in forming an opinion as to the least restrictive treatment option. Dr. Fish said that it would be possible to form an opinion as to the least restrictive

treatment option, and also as to the potential dangerousness, if he were allowed to listen to the testimony of Dr. Paine and Michael Pella, a licensed mental health practitioner at DCS. The Board found that Dr. Fish's presence during the testimony of such witnesses was "necessary" and "essential to the presentation of the State's case," and therefore, Dr. Fish was not sequestered.

The parties stipulated to Dr. Paine's qualifications as a licensed psychologist and her ability to testify as an expert about the psychological health of Dennis. Dr. Paine stated that she has a private practice and consults for the Community Mental Health Center, where there is an outpatient sex offender treatment program called the "Stop Program." Dr. Paine testified that the House for New Life referred Dennis to the Community Mental Health Center to be evaluated for treatment. As a result, Dr. Paine met with Dennis a total of nine times beginning on April 6, 2005, and ending on June 22.

The State asked Dr. Paine whether during the course of her treatment of Dennis she believed that he should be hospitalized. Dennis' counsel objected on the basis of psychologist-patient privilege. Dr. Paine testified that she believed Dennis should be hospitalized, and thereafter, the Board found that no privilege existed under Neb. Rev. Stat. § 27-504 (Reissue 1995). Thus, the objection was overruled. Dr. Paine testified that during the intake process for the Stop Program, she had told Dennis that he was in need of an inpatient program. Dr. Paine stated that she tried to have Dennis "EPC'd"—referring to an emergency protective custody order—after reviewing his medical information from DCS and a letter from Pella indicating that upon Dennis' release from incarceration, he should be "picked up."

During Dr. Paine's testimony, she described the intake process and evaluation of Dennis, stating that she detailed Dennis' clinical history, offense history, and sexual history; assessed his mental health problems; and attempted to complete a "battery of testing," which she was unable to complete because Dennis "did not come in enough times to finish." One of the tools that Dr. Paine used was the "Multiphasic Sex Inventory," which is used in the diagnosis of a potential sexual offender. The Multiphasic Sex Inventory demonstrated to Dr. Paine that Dennis was a pedophile, which Dennis admitted and which had already been established,

according to Dr. Paine. This tool also provided information about Dennis' progress, if any, since his prior sex offender treatment. Another tool that Dr. Paine used was the "Static 99," which is used only for individuals who have been convicted of a sexual offense. This tool assists the clinician in forming an opinion as to the level of risk that the offender will reoffend, as well as to the possible treatment options. Dennis obtained a score of six on the Static 99, and Dr. Paine stated that a score of six "places him in the high-risk category to sexually reoffend" and indicates that there is a "39 percent likelihood that [Dennis] would sexually reoffend within a period of five years, and a 45 percent likelihood that he would sexually recidivate in a period of ten years."

Dr. Paine testified that Dennis had told her about his prior convictions of sexual assault of a child, his estimated 30 victims (all male children) during his lifetime, his wide victim pool, and his predatory pattern of grooming his victims and befriending the parents in order to gain access to his victims. Also, Dr. Paine testified that Dennis' records indicated that he threatened to kidnap at least three children if their mother did not bring the children to his apartment. Dr. Paine also said Dennis told her that he used physical restraint with at least one child.

Regarding Dennis' past treatment, Dr. Paine testified that Dennis had told her he participated in and was terminated from an inpatient sex offender treatment program while he was incarcerated at DCS. Although Dennis told Dr. Paine that he could not remember why he had been terminated from the program, Dr. Paine discovered that his participation in the program was terminated because he was not disclosing information adequately, he was secretive and guarded, and he was "approaching boyish-appearing males on the unit for sexual contact."

Dr. Paine further testified that Dennis estimates "anywhere from 65 to 70 percent of his sexual energies, attractions, and urges are towards children." Dr. Paine stated that while Dennis had initially told her that he did not want to hurt any more children, he later stated to her that he did not believe that he hurt his victims. Dr. Paine testified as to her concerns about Dennis' inadequate and sometimes conflicting knowledge of the risk factors surrounding his pedophilia and concerns that he had become "treatment-savvy after three years-plus of sex-offender

treatment." Dr. Paine also determined that Dennis was "ego-syntonic," meaning that he is not uncomfortable with his sexual deviance.

Based upon Dennis' extensive history and clinical records from DCS, Dr. Paine's interviews with him, and the diagnostic tools such as the Multiphasic Sex Inventory and the Static 99, Dr. Paine diagnosed Dennis with pedophilia and avoidant personality disorder. She concluded that he was at the highest level of risk to reoffend, that his progress was "fairly minimal" during his participation in the program at DCS, and that he is "in need of sex-offender-specific therapy in an inpatient setting," which therapy is available only at the Lincoln Regional Center. When asked about other treatment options, Dr. Paine stated that she considered outpatient treatment but that she concluded outpatient treatment would not be sufficiently intense, "given the severity of [Dennis'] problem." Further, Dr. Paine stated that inpatient treatment was more appropriate than outpatient treatment because Dennis had already participated, but exhibited minimal progress, in the program at DCS, which program would have been more intense than an outpatient program.

After listening to the testimony of the State's other witnesses, Dr. Fish testified regarding his evaluation pursuant to the emergency protective custody order. Dr. Fish testified that he completed both a clinical personality assessment and the "Nebraska Sex Offender Risk Assessment Instrument," which was developed at the Lincoln Regional Center, and did an extensive history and clinical interview with Dennis. Dr. Fish stated that the Nebraska Sex Offender Risk Assessment Instrument classified Dennis as a Level 3 sex offender after he received a score of 165—a score as low as 130 means that one has a high risk of sexually reoffending. Dr. Fish testified that with Dennis' Level 3 classification, Dennis posed a "very high risk to offend again" with young children. With respect to the extensive history which Dr. Fish took, he said Dennis indicated that he "had been perpetrating since the age of 12 to the age of 27, at which time he was arrested," and that he had assaulted approximately 30 victims during that time. Dr. Fish also testified that Dennis admitted to keeping on his computer a list of 200 other potential victims. Dr. Fish stated that Dennis told him about Dennis' conviction and his

treatment while he was incarcerated and that Dennis' participation in the program was terminated for "assaultive and predatory" behavior. Based upon Dr. Fish's two interviews with Dennis, the testing done at Richard Young Hospital, the current risk factors, and Dennis' past history, Dr. Fish diagnosed Dennis with pedophilia, specifically with sexual attraction to males, which Dr. Fish said was "essentially . . . the same" as Dr. Paine's diagnosis. Dr. Fish testified that he discussed his diagnosis with Dennis and that Dennis agreed with the diagnosis. Dr. Fish stated that Dennis' insufficient knowledge of "using adequate behavioral strategies to keep his impulses under control," his "lack of internal motivation," his "past treatment failure," and his "continued attraction to young boys," as well as Dr. Paine's testimony that Dennis was ego-syntonic, led Dr. Fish to conclude that Dennis had a high risk for reoffending. Dr. Fish's opinion was that the least restrictive treatment option for Dennis was an inpatient program specifically for sexual offenders. When asked about considering less restrictive treatment options, Dr. Fish responded that he considered an outpatient treatment program but that such treatment would be insufficient because of the "level of risks" and because "[Dennis has] not yet successfully refocused [his] sexual attraction to adults." Dr. Fish further stated that an outpatient program would be insufficient for Dennis because of his inability to manage his impulses, to verbalize an awareness of the risk factors, and to use coping strategies to control his impulses.

With respect to the House for New Life, where Dennis was residing since his release from DCS, Pamela J. Hill, who lived at the House for New Life after her release from incarceration and worked there "on and off" for approximately 10 years, and Stogsdill testified about the level of supervision and the procedures at the House for New Life. Neither Hill nor Stogsdill is a psychologist.

Hill and Stogsdill testified that the House for New Life screens its potential applicants and then places them on an "Individualized Success Plan" (ISP). Dennis' ISP included attending his sessions with Dr. Paine, going to work daily, maintaining his hygiene, and attending Alcoholics Anonymous meetings once a week. Hill and

Stogsdill testified that children are not present in the House for New Life without adult supervision.

With respect to Dennis' work, Hill testified that Dennis worked for Staffing Services, which is a temporary staffing service that pays its workers on a daily basis. Hill stated that Staffing Services sent Dennis out of town for a job in Kansas, where he was not supervised by the staff at House for New Life and was out of town for at least 4 days. Hill further testified that Dennis was not supervised on his walks to and from work. Hill said that Dennis was not supervised when he attended his sessions with Dr. Paine, and Hill acknowledged that Dennis missed his counseling sessions with Dr. Paine on various occasions, including the entire month leading up to the hearing. Hill admitted that during the time since Dennis joined the House for New Life, she had not checked on whether Dennis attended his sessions with Dr. Paine. Stogsdill testified that Dennis had access to the Internet, while Hill testified that he did not.

Hill and Stogsdill both opined that the Board should allow Dennis to remain at the House for New Life with various restrictions and increased responsibilities as outlined in a proposed outpatient treatment plan designed specifically for Dennis. Stogsdill acknowledged that while he discussed the possible treatment plan with Dr. Paine, she did not endorse it. The Board questioned Stogsdill about the third item on the proposed treatment plan which reads: "Dennis . . . must have no contact with minors." Stogsdill acknowledged that this would not be possible because the House for New Life is in a residential neighborhood, children attend its church services, and Stogsdill's own son and a coworker's grandson visit the House for New Life.

On August 12, 2005, the Board decided that the evidence was clear and convincing that Dennis was mentally ill and dangerous to others. The Board further determined that the least restrictive treatment alternative available was inpatient care through the Department of Health and Human Services. The Board noted that based upon Dennis' high risk level of reoffending, the House for New Life was not an appropriate program. After Dennis appealed to the district court for Hall County, the Board's decision was affirmed in all aspects. Dennis then perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Dennis asserts that the district court for Hall County erred in affirming the decision of the Board because (1) Dr. Fish was allowed to remain present during the testimony of other witnesses, (2) Dr. Paine testified over a privilege objection by Dennis, and (3) the Board found that the least restrictive treatment alternative is commitment to the Department of Health and Human Services.

## STANDARD OF REVIEW

In reviewing a district court's judgment under the Nebraska Mental Health Commitment Act, appellate courts will affirm the district court's judgment unless, as a matter of law, the judgment is unsupported by evidence which is clear and convincing. *In re Interest of S.B.*, 263 Neb. 175, 639 N.W.2d 78 (2002). See *In re Interest of Kinnebrew*, 224 Neb. 885, 402 N.W.2d 264 (1987).

## ANALYSIS

*Sequestration of Witnesses.*

The rules of evidence in civil proceedings shall apply at all hearings held under the Nebraska Mental Health Commitment Act. Neb. Rev. Stat. § 71-955 (Cum. Supp. 2004). Further, according to Neb. Rev. Stat. § 27-615 (Reissue 1995), the general rule is that witnesses shall be excluded from a proceeding at the request of a party. This rule has certain exceptions, including "a person whose presence is shown by a party to be essential to the presentation of his cause." *Id.*

Here, Dennis asserts that the district court erred in affirming the decision of the Board to allow Dr. Fish to remain present during the testimony of the State's witnesses. The Board ruled that before it would allow Dr. Fish—who had the responsibility of evaluating Dennis in anticipation of the emergency protective custody hearing—to remain during the testimony, the State's attorney would have to show that Dr. Fish's presence was necessary to its case. We have recounted Dr. Fish's testimony about his efforts to secure background information via releases directed to DCS and to Dr. Paine. Dr. Fish explained how and why securing information, including Dennis' participation in a sex offender program while imprisoned, was unsuccessful, and we will not recount the entirety of that testimony here.

Dr. Fish testified that he formed an opinion as to Dennis' diagnosis after the evaluations of Dennis on August 1 and 3, 2005. Dr. Fish further testified that in order to determine Dennis' likelihood of reoffending and the least restrictive treatment alternative, Dr. Fish needed to know

> how [Dennis] has responded to treatment, whether [Dennis] has been in treatment, whether [Dennis has] completed treatment successfully, what the opinions of those professionals were with regard to [Dennis'] progress and outcome to that treatment [and] to what extent [Dennis] has been able to identify his own risk factors as well as employ strategies to prevent any sort of reoffending.

Dr. Fish stated that knowing how a patient reported his or her history to others would assist the doctor in forming an opinion as to the least restrictive treatment option. Due to Dennis' refusal to release his prior and relevant treatment information, in order for Dr. Fish to complete his clinical opinion, he needed to listen to Dr. Paine's testimony explaining Dennis' prior treatment, his responsiveness to the treatment, and how he reported his history to others. The Board found that Dr. Fish's presence during the testimony of such witnesses was "necessary" and "essential to the presentation of the State's case," and therefore, the Board did not sequester Dr. Fish.

In *State v. Jackson*, 231 Neb. 207, 435 N.W.2d 893 (1989), the Supreme Court of Nebraska held that an expert witness may be present in the courtroom, in contravention of a sequestration order, upon a showing that his or her presence is essential to the presentation of a party's case. In *Jackson*, the prosecutor explained to the court why the presence of the State's expert witness was necessary, as follows: "[The expert] ha[d] no opportunity under the law, unless the defense allow[ed], to examine the defendant at all, other than to be present in court when she testifie[d]." *Id.* at 213, 435 N.W.2d at 897. Accordingly, we find that the law set forth in § 27-615 and in *Jackson* is clear, and the exception to the sequestration of witnesses is applicable to the present case.

Without Dr. Fish's presence during the testimony of Dr. Paine, he would not have obtained important background information about Dennis' prior treatment, including the fact that Dennis'

participation had been terminated from the sex offender pro-
gram at DCS for approaching boyish-looking inmates for sexual
contact, for not disclosing sufficiently, and for being secretive.
Absent such important information, Dr. Fish would not have
been able to accurately form his clinical opinion as to Dennis'
likelihood of reoffending and to the least restrictive treatment al-
ternative. Therefore, the district court did not err in affirming the
Board's allowance of Dr. Fish's presence during the testimony of
the State's witnesses.

*Physician-Patient Privilege.*

Section 27-504(2)(a) sets forth the following physician-
patient privilege that applies to individuals such as a licensed
psychologist:

> A patient has a privilege to refuse to disclose and to prevent
> any other person from disclosing confidential communica-
> tions made for the purposes of diagnosis or treatment of his
> or her physical, mental, or emotional condition among him-
> self or herself, his or her physician, or persons who are par-
> ticipating in the diagnosis or treatment under the direction
> of the physician, including members of the patient's family.

However, under § 27-504(4)(a), such privilege is nullified in
"proceedings to hospitalize the patient for physical, mental, or
emotional illness if the physician, in the course of diagnosis or
treatment, has determined that the patient is in need of hospital-
ization." Section 27-504(1)(b) defines "physician" as including
"a person licensed as a psychologist under the laws of any state
or nation who devotes all or a part of his or her time to the prac-
tice of psychology." Contrary to Dennis' assertion that Neb. Rev.
Stat. § 71-1,206.29 (Reissue 2003) trumps the rule set forth in
§ 27-504 and the exception therein, § 71-1,206.29 specifically
mentions the applicability of § 27-504. Accordingly, it is clear
that § 27-504 and the exception therein are applicable to Dr.
Paine's testimony.

In this case, Dennis is asserting that the district court erred in
affirming the Board's decision to allow Dr. Paine to testify over
Dennis' privilege objection. We disagree. The requirements for
the exception to the privilege in § 27-504(4)(a) were clearly met
because (1) the parties stipulated that Dr. Paine was a licensed
psychologist, (2) Dr. Paine testified that she was diagnosing and

treating Dennis during their nine sessions, and (3) Dr. Paine, prior to her testimony about her specific treatment of Dennis, testified that she believed Dennis should be hospitalized and that she made such determination in the course of her diagnosis and treatment of him. Additionally, Dr. Paine testified that she attempted to have an emergency protective custody order issued on Dennis.

The Board had ample evidence before it that the exception to the privilege found in § 27-504 applied, and therefore, we find that the district court correctly affirmed the Board's allowance of Dr. Paine's testimony after the Board ruled that there was no privilege under § 27-504(4)(a).

*Least Restrictive Treatment Alternative.*

Dennis' third assignment of error asserts that the district court erred in affirming the Board's decision that the least restrictive treatment alternative is commitment to the Department of Health and Human Services. In *In re Interest of Vance*, 242 Neb. 109, 115, 493 N.W.2d 620, 624 (1992), the Nebraska Supreme Court wrote that "a board can commit a person for inpatient treatment," but as explained in Neb. Rev. Stat. § 71-925(6) (Cum. Supp. 2004), "[a] treatment order by the mental health board under this section shall represent the appropriate available treatment alternative that imposes the least possible restraint upon the liberty of the subject." Section 71-925(6) additionally states: "The board shall consider all treatment alternatives, including any treatment program or conditions suggested by the subject, the subject's counsel, or other interested person. Inpatient hospitalization or custody shall only be considered as a treatment alternative of last resort. . . ." The *In re Interest of Vance* court held: " ' "The key to confinement of one who is mentally ill lies in the finding that he is dangerous, i.e., that absent confinement, he is likely to engage in particular acts which will result in substantial harm to himself or others." ' " 242 Neb. at 115, 493 N.W.2d at 624, citing *In re Interest of McDonell*, 229 Neb. 496, 427 N.W.2d 779 (1988).

According to the facts before us, it is obvious that the Board had clear and convincing evidence that Dennis was dangerous to others, especially young boys. Dennis does not assign error to the Board's conclusion that he was mentally ill and dangerous. Rather, Dennis attacks the district court's affirmance of the

Board's finding that the least restrictive treatment option for Dennis was inpatient treatment. In determining whether inpatient treatment was the least restrictive option, we find Dr. Paine's and Dr. Fish's testimonies compelling.

Dr. Paine's opinions were based upon the extensive history and clinical records from DCS, her interviews with Dennis, and diagnostic tools such as the Multiphasic Sex Inventory and the Static 99. Dr. Paine diagnosed Dennis with pedophilia, and Dennis did not disagree. Dr. Paine testified that she realized Dennis should be in an inpatient program and that she so informed Dennis. Dr. Paine stated that Dennis was at the highest level of risk to reoffend, that his progress was "fairly minimal" during his participation in the program at DCS, and that he was "in need of sex-offender-specific therapy in an inpatient setting," which therapy is available only at the Lincoln Regional Center. Dr. Paine testified that she considered outpatient treatment for Dennis but that she decided outpatient treatment would not be sufficiently intense, "given the severity of [Dennis'] problem." Dr. Paine also stated that inpatient treatment was more appropriate than outpatient treatment because Dennis had already participated, but exhibited minimal progress, in the program at DCS, which program would have been more intense than an outpatient program.

In addition to Dr. Paine's expert opinion, Dr. Fish also testified that he diagnosed Dennis with pedophilia and that Dennis had a high risk of reoffending. Dr. Fish stated that the Nebraska Sex Offender Risk Assessment Instrument classified Dennis as a Level 3 sex offender after he received a score of 165, which places Dennis in a "very high risk to offend again" with young children—a score as low as 130 means that one has a high risk of sexually reoffending. Dr. Fish testified that the least restrictive treatment option for Dennis was an inpatient program specifically for sexual offenders. Dr. Fish stated that he considered less restrictive treatment options but that such treatment would be insufficient because of the "level of risks" and because "[Dennis has] not yet successfully refocused [his] sexual attraction to adults." Dr. Fish further stated that an outpatient program would be insufficient for Dennis because of his inability to manage his impulses, to verbalize an awareness of the risk factors, and to use coping strategies to control his impulses.

The Board considered a less restrictive treatment alternative—living at the House for New Life. This proposed outpatient treatment plan designed specifically for Dennis called for "no contact with minors." However, Stogsdill acknowledged that this was not possible due to the location of the House for New Life, the fact children visit the House for New Life, and the fact children attend services at its church. Under the proposed outpatient treatment plan, Dennis would not be supervised while walking to and from work; at work, including when he works out of town; or in the waiting room at his counseling sessions. The Board did not err in rejecting the outpatient treatment plan, because of Dennis' high risk level of reoffending.

We find that the Board considered the treatment alternatives. In the end, the Board followed the unrefuted clinical opinions of the two expert psychologists. We find that as a matter of law, the district court's judgment affirming the Board's conclusion that the least restrictive treatment alternative is inpatient treatment is supported by clear and convincing evidence. See, *In re Interest of S.B.*, 263 Neb. 175, 639 N.W.2d 78 (2002); *In re Interest of Kinnebrew*, 224 Neb. 885, 402 N.W.2d 264 (1987). We affirm the district court's decision that inpatient treatment is the least restrictive treatment alternative.

## CONCLUSION

The district court did not err in affirming the decision of the Board. The Board's allowance of Dr. Fish to remain present during the testimony of Dr. Paine and Pella was not error. The Board's finding that Dr. Paine could testify over the privilege objection by Dennis was correct. Finally, after the Board considered the treatment options, the Board correctly determined that the least restrictive treatment alternative was an inpatient program. The evidence presented with respect to Dennis' pedophilia, his high risk of reoffending, and his need to be in an inpatient treatment program provides clear and convincing evidence that as a matter of law, the district court correctly affirmed the Board's findings. We affirm.

AFFIRMED.