IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF R.C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF R.C., ALLEGED TO BE A MENTALLY ILL AND DANGEROUS PERSON.

R.C., APPELLANT,
V.
MENTAL HEALTH BOARD OF THE FOURTH JUDICIAL DISTRICT, APPELLEE.

Filed February 20, 2024.    No. A-23-453.

Appeal from the District Court for Douglas County: TODD O. ENGLEMAN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Hilary A. Burrows for appellant.

Jameson D. Cantwell, Deputy Douglas County Attorney, for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

The Mental Health Board of the Fourth Judicial District (the Board) entered a commitment order for the involuntary inpatient treatment of R.C., pursuant to the Nebraska Mental Health Commitment Act, Neb. Rev. Stat. § 71-901 et seq. (Reissue 2018). The Douglas County District Court affirmed the Board's order. R.C. challenges findings that he was mentally ill, that he posed a significant risk of harm to himself and others, and that inpatient treatment was the least restrictive treatment available. We affirm.

## BACKGROUND

R.J. presented to the emergency department of a hospital on October 17, 2022, "focused on multiple rape experiences . . . by a lot of people . . . including famous people, . . . psychiatrists,

- 1 -

police officers, and animals." His speech was "pressured" and it was difficult to converse with him because he would speak "almost nonstop."

On October 25, 2022, the county attorney's office in Douglas County (the State) filed a petition with the Board, alleging R.C. was a mentally ill and dangerous person and requesting a hearing on the matter. A hearing took place on November 10; evidence was adduced regarding R.C.'s mental condition at the time of the hearing. R.C. and his treating psychiatrist testified at the hearing and three exhibits were received into evidence, including a treatment plan for R.C.

Dr. Imad Alsakaf testified that he had been employed as a psychiatrist at the treating hospital for 9 years. He became familiar with R.C. because he saw him numerous times in the emergency department and eventually "became his doctor" on October 27, 2022. R.C. had been in the "special cares unit" at the hospital since October 18 or 19. Dr. Alsakaf testified that when R.C. initially arrived at the emergency department, he was under the care of Dr. Kent, but R.C. "fired" Dr. Kent because he believed Dr. Kent was not writing accurate information about him.

Dr. Alsakaf met with R.C. daily, except weekends when he was not on call. Dr. Alsakaf stated that R.C. had "fixed delusions about him being raped and tortured and poisoned." R.C. was emotionally attached to those beliefs and they caused him significant stress. R.C. repeatedly described these delusions over the course of his treatment by Dr. Alsakaf. This was also R.C.'s fixation during prior treatments by other psychiatrists, therapists, and nursing staff. R.C. was previously hospitalized at the same treating hospital in April 2021 and June 2022. Those hospitalizations were for "[t]he same focus on the same rape experiences and torture experiences[,] [n]oncompliance with medications[,] [and] [b]eing pressured." R.C. had been hospitalized at another facility in April 2016.

According to Dr. Alsakaf, R.C.'s delusions could affect his behavior and R.C. had "mentioned more than once that he want[ed] to kill a lot of people," including the individuals he believed had raped and poisoned him. R.C. indicated that he would "kill them with pipe bombs" which, according to R.C., were "easy to make." Dr. Alsakaf stated that R.C.'s beliefs got in the way of R.C. having a "quality life in terms of interaction with people," and "it's really almost impossible to have a meaningful conversation with him about anything whatsoever." According to Dr. Alsakaf, R.C. had difficulty communicating with his family members, and when his legal guardian would try to visit him once a week to bring him money and food, R.C. would not open the door. Dr. Alsakaf also noted that R.C. was "kicked out" of several locations in the community.

When asked if R.C. "needed any as-needed medications due to agitation or aggression," Dr. Alsakaf responded, "Yes . . . quite a lot." The medications were administered almost daily when R.C. became agitated, loud, and argumentative with staff and patients, as well as when he refused to accept treatment. Dr. Alsakaf testified that other patients found R.C. to be intimidating and that they would isolate themselves in their rooms when R.C. became agitated. Dr. Alsakaf stated that in the previous week, R.C. refused to meet with him on two or three occasions. Dr. Alsakaf was able to meet with R.C. in the presence of security, however R.C. behaved very aggressively and assaulted Dr. Alsakaf. He stated that R.C. had since been calmer because he was receiving "as-needed medications." Dr. Alsakaf did not have concerns regarding R.C.'s hygiene since R.C.'s arrival at the hospital, but he was concerned about R.C.'s sleep habits. R.C. slept "significantly less than [is] normal," at times sleeping for only 1.8 hours. R.C.'s sleep had improved during his stay at the hospital.

When asked whether he had "reached a diagnosis to a reasonable degree of psychiatric certainty" based on his work with R.C. and a review of the records, Dr. Alsakaf responded, "Yes." He diagnosed R.C. with "schizoaffective disorder, bipolar type." Dr. Alsakaf agreed that this psychiatric disorder involves "a severe or substantial impairment of a person's thought process, sensory input, mood[] balance, memory, or ability to reason" and can interfere with an individual's "ability to meet the ordinary demands of daily living." The illness can also "interfere with the safety of a person or the safety or well-being of others." Dr. Alsakaf did not believe R.C. had any insight into having a mental illness.

R.C. had been prescribed an antipsychotic medication, but Dr. Alsakaf stopped the medication because R.C. had refused to take it since his admission to the hospital. R.C. refused to take any medications, except for a couple as-needed medications. Dr. Alsakaf believed R.C.'s refusal to take medications would put R.C. and others at risk of harm. Dr. Alsakaf asked the Board to "keep the option open" for providers and R.C. to "choose any of the long-acting preparations that are available." He then identified a list of medications for the Board to consider. He believed it was in R.C.'s best interests to receive medication against his will and that his condition could improve with the medications. When asked if there was "anything else short of forcibly administering a medication that [would] substantially improve [R.C.'s] mental health," Dr. Alsakaf responded, "No." The listed medications could have various side effects, such as movement disorders, weight gain, insulin sensitivity, hypolipidemia, and stomach discomfort. However, Dr. Alsakaf stated that the benefits of the medications outweighed the detriments of the possible side effects, and that the side effects could be monitored.

The State introduced into evidence Dr. Alsakaf's treatment plan for R.C. Dr. Alsakaf had not discussed the treatment plan with R.C. because he had difficulty communicating with R.C. Dr. Alsakaf believed R.C. needed inpatient treatment in the "near future and intermediate future." He recommended that R.C. stay at the hospital and then be admitted to a long-term inpatient facility; if R.C.'s condition improved, he could be moved to a group home. According to Dr. Alsakaf, the treatment plan he recommended was the least restrictive treatment available for R.C. at the time of the hearing.

Dr. Alsakaf opined that if released, R.C. would pose a substantial risk of harm to himself and others. Dr. Alsakaf did not believe R.C. was a danger to himself "in terms of suicide," but was a "danger to himself in terms of taking care of the activities of daily living," even with the assistance of his legal guardian. It was Dr. Alsakaf's opinion that R.C. would not be able to meet his basic human needs, such as food, clothing, and shelter; nor care for his own psychiatric or personal safety. He was specifically concerned about R.C. being able to take care of the activities of daily living, to communicate with people effectively, and to receive necessary services. He further stated that the "most important concern" was R.C.'s "homicidal ideations and the plans against a lot of people or entities."

R.C. testified that if he were released, he would live alone in his house in Omaha, Nebraska. When asked if he had a means of obtaining food, he responded, "No. Actually, I don't." When asked if he could take care of himself on a daily basis, he responded, "I cannot because I'm denied goods and services within the city." He stated that it would be possible that he could work with his legal guardian to access his bank account. R.C. did not believe he was a danger to himself or others.

Following the close of evidence, the Board deliberated and found by clear and convincing evidence that the allegations in the petition were true. The Board found that R.C. had a mental illness, based on Dr. Alsakaf's diagnosis of schizoaffective disorder, bipolar type. The Board further found that R.C. was a danger to himself and others and was incapable of caring for his own basic human needs. The Board approved the use of forced medication by injection if needed and found the least restrictive treatment to be inpatient hospitalization "until such time as the treatment plan . . . can be implemented." That same day, the Board entered a commitment order consistent with its findings at the hearing.

R.C. appealed to the district court seeking to reverse the commitment order. He challenged the Board's findings that there was clear and convincing evidence to support a diagnosis of schizoaffective disorder, bipolar type; that he posed a risk of harm to himself or others; and that inpatient treatment was the least restrictive treatment available. Following a hearing, the court entered an order on May 16, 2023, affirming the commitment order.

R.C. timely appealed from the district court's order.

## ASSIGNMENTS OF ERROR

R.C. assigns that the Board erred in finding that there was clear and convincing evidence (1) to support his diagnosis of schizoaffective disorder, bipolar type, pursuant to § 71-907, (2) that he presented a substantial risk of serious harm within the near future to himself or others pursuant to § 71-908, and (3) that the proposed treatment plan was the least restrictive alternative pursuant to § 71-925(1). Although R.C. frames his assignments of error as challenging the Board's findings, he appeals from the order of the district court. We therefore treat his assignments of error as challenging the court's affirmance of the Board's findings.

## STANDARD OF REVIEW

The district court reviews the determination of a mental health board de novo on the record. *In re Interest of S.J.*, 283 Neb. 507, 810 N.W.2d 720 (2012). In reviewing a district court's judgment, an appellate court will affirm unless it finds, as a matter of law, that clear and convincing evidence does not support the judgment. *Id*.

## ANALYSIS

### MENTAL ILLNESS DIAGNOSIS

Under § 71-925(1), an individual may be committed by a mental health board only if the State proves by clear and convincing evidence that:

> (a) the subject is mentally ill and dangerous and (b) neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by the mental health board are available or would suffice to prevent the harm described in section 71-908.

R.C. argues that the evidence was not sufficient to support a finding that he was mentally ill. Section 71-907 defines "mentally ill" as:

> having a psychiatric disorder that involves a severe or substantial impairment of a person's thought processes, sensory input, mood balance, memory, or ability to reason which

substantially interferes with such person's ability to meet the ordinary demands of living or interferes with the safety or well-being of others.

R.C. contends there was not clear and convincing evidence to support his diagnosis of schizoaffective disorder, bipolar type. The State argued to the district court and now to this court that R.C. cannot raise this issue on appeal because he failed to object to the diagnosis at the hearing. The district court agreed with the State, but nevertheless proceeded to find that there was clear and convincing evidence that R.C. suffered from a mental illness. In support of its argument, the State cites to the legal proposition that "[e]rror cannot be predicated on *admission* of evidence to which no objection was made when the evidence was adduced." *Benzel v. Keller Indus.*, 253 Neb. 20, 26, 567 N.W.2d 552, 557 (1997) (emphasis supplied). However, we do not read R.C.'s argument to challenge the admissibility of Dr. Alsakaf's diagnosis. Rather, R.C. challenges the weight and credibility of that diagnosis. Regardless, like the district court, we find that R.C.'s argument fails since there was clear and convincing evidence that R.C. suffered from a mental illness.

Dr. Alsakaf testified that at the time of the hearing, he had been treating R.C. for 2 weeks. He met with R.C. almost every day during that time, except during the weekends and when R.C. refused to meet with him. He reviewed the accounts of nurses and staff who interacted with R.C., as well as records regarding R.C.'s prior hospitalizations. According to Dr. Alsakaf, R.C. had fixed delusions that he had been raped, tortured, and poisoned thousands of times by many individuals, including famous people, family members, police officers, medical staff, prostitutes, and animals. R.C. was emotionally attached to those beliefs and they caused him significant stress. It appeared that R.C. was fixated on the same delusions during prior treatment by other medical providers. Dr. Alsakaf observed that R.C. had difficulty effectively communicating with others and was often agitated, loud, and intimidating. R.C. even attacked Dr. Alsakaf during one of their meetings.

Based on his work with R.C. and R.C.'s medical history, Dr. Alsakaf diagnosed R.C. with schizoaffective disorder, bipolar type, and he had reached this diagnosis to a reasonable degree of psychiatric certainty. When asked if the "psychiatric disorder involv[ed] a severe or substantial impairment of a person's thought process, sensory input, mood[] balance, memory, or ability to reason," Dr. Alsakaf responded, "Yes." He further stated it could impact an individual's ability to meet the ordinary demands of daily living.

On appeal, R.C. challenges the diagnosis, implying that Dr. Alsakaf did not have sufficient time to reach an accurate diagnosis, to complete an adequate review of R.C.'s mental health records, or to properly investigate R.C.'s possible traumatic experiences. R.C. also claims that he did not exhibit enough symptoms in the hospital to support the diagnosis and "Dr. Alsakaf failed to provide legitimate examples of R.C.'s delusions and was unable to verify they were, in fact, delusions." Brief for appellant at 14. He further notes that Dr. Alsakaf never described the typical symptoms of an individual with the type of psychiatric disorder with which R.C. was diagnosed. In response to similar arguments made on direct appeal, the district court found that these issues were related to the credibility of the witness and that R.C. could have raised them during cross-examination. We agree with the court's assessment and therefore find that there was clear and convincing evidence that R.C. had a mental illness.

R.C. argues that there was not clear and convincing evidence that he presented a substantial risk of serious harm within the near future to himself or others. Section 71-908 provides, in part, that a "mentally ill and dangerous person" is someone who is mentally ill and because of such mental illness presents:

(1) A substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm; or

(2) A substantial risk of serious harm to himself or herself within the near future as manifested by evidence of recent attempts at, or threats of, suicide or serious bodily harm or evidence of inability to provide for his or her basic human needs, including food, clothing, shelter, essential medical care, or personal safety.

R.C. contends that although Dr. Alsakaf testified that R.C. would not be able to meet his basic human needs, the evidence was to the contrary. He points to his testimony that if released, he would be able to resume living in his house in Omaha. He claims there was no evidence he would not be able to obtain clothing for himself, nor was there evidence that he had any medical conditions which would go untreated if released. Further, he notes that his legal guardian would be able to address any of his needs that he otherwise could not meet on his own.

Although R.C. might have been able to meet some of his own needs upon release, the evidence showed he would not have been able to meet all of them. R.C. testified that he would not be able to take care of himself on a daily basis and that he would not have access to food. He indicated that he struggled to secure transportation, to access the funds in his bank account, and to obtain goods and services. According to Dr. Alsakaf, R.C.'s condition made it very difficult for R.C. to effectively communicate with others, contributing to his inability to obtain goods and services. And although R.C. claims on appeal that his legal guardian could have assisted him in meeting those needs, his only testimony in support of this was that it was "entirely possible" his legal guardian could assist him in accessing his bank account. However, it appeared that in the past, his legal guardian had trouble meeting with him. Dr. Alsakaf noted that R.C.'s legal guardian had attempted to bring R.C. food and money, but that R.C. refused to open the door for her.

R.C. also argues that he did not pose a threat of harm to others, noting that there was no testimony that he "had ever physically harmed another person before" or that he "was a danger to others beyond being generally agitated and 'intimidating.'" Brief for appellant at 20. However, as we previously noted, a person may be found to pose a substantial risk of harm to others "by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm." See § 71-908. Dr. Alsakaf testified that in the week prior to the hearing, R.C. had refused to meet with him multiple times and when R.C. finally met with him, he assaulted Dr. Alsakaf. Dr. Alsakaf also testified that R.C. indicated he wanted to "kill a lot of people." On appeal, R.C. discounts Dr. Alsakaf's testimony since "no testimony was presented that indicated any of R.C.'s 'fixed delusions' had anything to do with statements of harming others." Brief for appellant at 20. However, Dr. Alsakaf testified that R.C.'s delusions "could really effect his behavior" and that R.C. "mentioned that he had . . . plans to kill a lot of people including family members" and "people

who he says raped him in the past." R.C. indicated to Dr. Alsakaf that he planned to use a pipe bomb, which would be "easy to make." R.C.'s specific plans to harm others are clearly linked to his fixed delusions that he was previously victimized by many individuals.

To the extent R.C.'s argument relies upon his own testimony that he would not pose a risk of harm to himself and others upon his release, it is apparent that the Board did not find his testimony to be credible. Although a reviewing court is not required to give deference to the findings of fact made by the mental health board, it may consider the fact that the board, sitting as the trier of fact, saw and heard the witnesses and observed their demeanor while testifying, and may give weight to the board's judgment as to credibility. See *In re Interest of J.R.*, 277 Neb. 362, 762 N.W.2d 305 (2009). We therefore find that there was clear and convincing evidence that R.C. posed a substantial risk of harm to himself or others.

## LEAST RESTRICTIVE TREATMENT ALTERNATIVE

R.C. claims that inpatient treatment with forced medications by injection was not the least restrictive treatment option available. Under § 71-925(1), the State has the burden to prove by clear and convincing evidence that "neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by the mental health board are available or would suffice to prevent the harm described in section 71-908." A mental health board, after considering all treatment alternatives including any treatment program or conditions suggested by the subject, the subject's counsel, or other interested person, can commit a person for inpatient treatment; such a treatment order shall represent the appropriate available treatment alternative that imposes the least possible restraint upon the liberty of the subject. See § 71-925(6). See, also, *In re Interest of Dennis W.*, 14 Neb. App. 827, 717 N.W.2d 488 (2006). Inpatient hospitalization or custody must only be considered as a treatment alternative of last resort. See *id*.

Dr. Alsakaf recommended that R.C. remain at the hospital while working on his treatment plan. The treatment plan included R.C. taking his medications, following doctor's recommendations, and "work[ing] with the team towards discharge planning." Dr. Alsakaf recommended that R.C. then be admitted "to a long-term inpatient care facility," such as "Lincoln Regional Center, telecare, [or] integrated behavioral health." Dr. Alsakaf stated that he "really believe[d] in the near future and intermediate future, [R.C. would] need inpatient treatment" and that this was the least restrictive treatment possible at the time of the hearing.

R.C. contends that "Dr. Alsakaf provided no timeline of stabilization for R.C. to remain inpatient or what milestones should be met before R.C. [can] transition to an outpatient setting." Brief for appellant at 21. On direct appeal, the district court noted that those "are all dependent upon the cooperation and progress made by R.C. in his treatment plan," which "Dr. Alsakaf would not be able to predict." We agree with the court's assessment. We further note that any voluntary treatment or outpatient treatment was unlikely to have been adequate, since R.C. was resistant to receiving treatment, even stopping Dr. Alsakaf from asking him questions that R.C. characterized as "health care," for which R.C. claimed he did not need Dr. Alsakaf. According to Dr. Alsakaf, R.C.'s psychiatric condition required antipsychotic medications, but R.C. refused to take such medications and had a history of noncompliance with his medications. Dr. Alsakaf stated that R.C. did not recognize that he was mentally ill and suffered from delusions. As such, it is not likely that

R.C. would have complied with his prescribed psychiatric medications or maintained necessary psychiatric care if he were to have received less restrictive treatment. Without such necessary psychiatric care, R.C. would have remained a danger to himself or others. We therefore find that there was clear and convincing evidence that inpatient treatment was the least restrictive treatment possible for R.C. at the time of the hearing.

CONCLUSION

For the reasons set forth above, we affirm the district court's May 16, 2023, order affirming the Board's November 10, 2022, commitment order.

AFFIRMED.